Chairman, U.S. House Permanent Select Committee on Intelligence, and U.S. House Permanent Select Committee on Intelligence. Mr. Peterson for the appellant, Mr. Thieleman for the appellate. Mr. Peterson, good morning. Good morning, your honors, and may it please the court. This case is about shedding light on unprecedented and illegitimate congressional subpoenas. The extraordinary subpoenas at issue represent a supposedly unlimited government surveillance power and an unlimited ability by Congress to, at their whim, to invade the privacy of any American. Defendants refuse to release these subpoenas, seeking the private phone records of various individuals, including even a reporter. Yet all other subpoenas issued as a part of their investigation are, and this is important, are publicly available on the committee's website. But defendants refuse to release the ones that we are seeking. We believe the public has a right to know why. As a part of his investigation, Congressman Schiff secretly subpoenaed the phone records of a number of private citizens from telephone companies. He did not provide notice to these individuals in advance that their phone records were being sought. He did not subpoena the phone records directly from the citizens. Instead, he subpoenaed the phone companies for their records, preventing any opportunity for the private citizens to seek court review, as would happen in any other case in where the government is seeking this kind of information about any citizen. Mr. Peterson, let me ask you one thing, and that is, I can't find anywhere in the record, in the online report of the Intelligence Committee, any description of the subpoena other than certain phone numbers. Is that your understanding? Well, there's been various reporting on the issue. There's been, you know, whispers around town about what it is. From defendants' descriptions, in their brief, you know, there's at least a half a dozen subpoenas that went out concerning different people to potentially different- Well, now let me correct you. Concerning phone numbers, that's what I'm trying to tie down. And we don't have, in the record, anything that I can find other than the online report, which, in footnotes, gives the dates of subpoenas for phone numbers, not people. In other words, the subpoena, we don't know what the subpoena said. Right. But is there any evidence that the subpoena said, we want Joe Blow's phone records? From what I can tell, they said, we want 803-256 blah, blah, blah, blah, blah. Well, defendants have not disputed that they sought the records of individuals by name. They went to AT&T and asked for the president's lawyers' records, Rudy Giuliani, by name. They haven't seen the subpoenas. And that's really part of the point here is we would like to see the subpoenas. That's what this is about. And I also agree that the facts have not been fully developed here, yet the case was dismissed on a motion to dismiss. And we're here asking these questions. So, counsel, is issuing a subpoena pursuant to oversight within the committee's jurisdiction on a matter within the committee's jurisdiction, a legislative act? Usually, it would be, Your Honor. Typically, that's what the case law tells us. It is not always, however. I mean, there are examples, starting with Kilbourn, leading through Watkins and others, where the courts have been very careful to say that it is not an unlimited power to issue subpoenas. There are exceptions where the American's rights have to be protected. So, in this case, we believe, we've certainly, we've more than adequately alleged that it is not a legislative act, and therefore, the speech or debate protection does not apply. Is issuing a subpoena pursuant to an impeachment investigation a legislative act? Again, it would depend. I mean, it would depend. And that's part of the point here of what we're trying to find out. Will any subpoena? No, I don't think so. And I don't think the court should be in a position of saying that for the purposes of the next case, any subpoena is going to be fine. I mean, otherwise, there will be no limit to what committee chairmen, on their own volition, may go looking for, just because they find it of interest at that moment. There has to be some restraint. There has to be some limit. And the courts, up to this point, have said that. Shouldn't we look beyond the facts alleged in your complaint to make that determination? I mean, you can't just kind of plead your way around the speech and debate clause by saying something's not a legislative act. We would not. We're certainly fine with having the factual record more fully developed. I mean, that was what we're asking for, is to have this case sent back down and to have the facts fleshed out. I mean, what all you have before you, Your Honors, at this point, is what we believe is our well-pled allegations and statements by defendant's lawyers. That's what the record consists of. No evidence. So, that is why, basically, Your Honors, we are seeking, under the Common Law Right of Access, these subpoenas. There is no legislative purpose to it. Speech or debate does not apply. Legislative independence is not going to be impacted by releasing these subpoenas, all of which, all the others of which, have already been released on their own website. They are public records. They are official records, because they were prepared, finalized, and issued to these phone companies. So, in that respect, they are not the kinds of preliminary types of records that the District Court received. They are final, official records, and the Common Law Right of Access exists to disclose this type of information. Again, all the other subpoenas are on their website. We've more than, in the public interest, is served by, under the Common Law Right of Access, by making this kind of information available. Under defendant's theory, at a minimum, there is a factual question as to whether the subpoenas are proper. Why did they go to the phone companies and not to the individuals? Why did they do this backdoor approach? Why did they need a reporter's phone calls? These are factual questions that have not been answered. There's the questions of the unlimited power to invade privacy of Americans. I would like to reserve the rest of my time, you know, going forward, unless the others have any other questions at this point. All right. Mr. Tatelman. Thank you, Your Honors. Good morning. Todd Tatelman for the House Permanent Select Committee on Intelligence and Chairman Schiff. I'll start with picking up on Judge Wilkins' question, which was that plaintiffs can't plead their way around the speech or debate clause. And that has been made clear by this court on any number of occasions, most recently in the court's opinion in Rangel v. Boehner, where this court said specifically that the mere allegations of House rules, federal laws, or even the Constitution is not sufficient to overcome the absolute immunity afforded by the speech or debate clause of the Constitution. That's essentially what we have here, Your Honors, is plaintiffs are alleging that because they think Mr. Schiff and the committee violated House rules, the Constitution, or other federal laws, that they're entitled to bring the committee into court and to get a court order to produce various legislative documents. That's simply exactly what the speech or debate clause was intended to prevent and protect, and the Supreme Court and this court have been very clear about that fact in virtually every case that has been decided raising the clause as a defense. Rangel v. Boehner is one of the most recent examples. Same thing in other cases, including McShirley v. McClellan, Eastland v. U.S. Servicemen's Fund, and a whole host of others that we've cited in our brief. At the end of the day, this is a case about the production of various legislative documents. The subpoenas themselves, regardless of whether all or some or even any of them have been posted on the committee's website, remain legislative documents. They remain protected by the speech or debate clause, and the plaintiff simply cannot bring the committee and its chairman into court and require a court order that we produce them. This court made clear in Brown Williamson that the committees have a right to protect their own legislative records, and that's what the committee has chosen to do here. It has particular reasons why it chose to release the documents that it chose to release, why it included the information it included in its final report, and it has opted not to publicly release these particular subpoenas, primarily for the reason that Judge Henderson mentioned, which was that the subpoenas themselves are to third-party telecommunications companies and are seeking personally identifiable information, various phone numbers, and other types of things. So the committee has not released any of those subpoenas. It was very careful in its report not to release that kind of information. What it released was the information that it obtained making the connections between various phone numbers and individuals that it was able to make based on the information that it had obtained. Well, let me ask you about that, Mr. Tittleman. I'm looking at page 44 of the report just as an example, and the footnote 49, well, here's the sentence in the report. Phone records show that in the 48 hours before publication of the Hill opinion piece, Mr. Parnas spoke with Mr. Solomon. Footnote 49. Footnote 49 cites AT&T document production and then Bates and AT&T and then the committee's initials, and I read the next figure to be the date that it issued. That is September 19th, 2019, or September 30th, 2019. Yes, Your Honor, I believe that that is correct. All right, so you've identified, when you say you haven't identified in the report the subpoena, you have at least identified who it went to, AT&T, and the date it went. That is correct, Your Honor. The wording there, I think, was very deliberately chosen by the committee. Again, what the committee was doing at the time was it was engaged in a full-fledged both oversight and investigation, as Judge Wilkins mentioned, as well as an impeachment inquiry, as the Speaker of the House made clear several days earlier on September 24th. Well, I'd like to ask you about that because the impeachment resolution didn't come until October 31st. The resolution that was adopted by the House, correct, Judge Henderson, H.R.S. 660 doesn't come until October, but that's not, in fact, an impeachment resolution in, I believe, the sense that you're thinking of it as. What that was was a procedural resolution that allowed certain procedures by the committees that followed it to occur. There doesn't need to be, under House precedent and practice, an impeachment resolution prior to an investigation or an inquiry into impeachment beginning, and there wasn't in this case. H.R.S. 660 laid out for the Committee on Intelligence some requirements about how it and it also required the committee to produce the report that it eventually produced, referring, recommending, excuse me, to the Judiciary Committee whether or not the Judiciary Committee should draft and approve articles of impeachment. H.R.S. 660 set out for the House and for the committees those procedures that it was to follow from that point forward, but the inquiry underlying that, the impeachment inquiry and the oversight related to the Ukraine were all well established, predated that resolution, and were well within the committee's jurisdiction at the time it issued this particular subpoena. So you're not relying on the Speaker's, I guess, announcement in early September that the committees are to proceed? No, Your Honor. I believe we're doing both, which is to say we believe that both parts of the Gravel test related to whether speech or debate are applicable, we're satisfied here. First of all, the underlying oversight and investigation that had been taking place prior to the Speaker's announcement satisfied the first part of the Gravel test because they are an integral part of the deliberative and communicative process of the House. And then the second part of the test, which is the part related to the impeachment inquiry, because impeachment is a matter specifically delegated by the Constitution to the House, is also satisfied. So we are, in fact, relying on both. So even if you were to find that the impeachment inquiry was entirely based on the resolution that comes later, we don't think that changes the ultimate outcome here because the underlying investigation that was ongoing as of September 30th when this particular legislative act, there was a legitimate legislative purpose and all of the other requirements are satisfied. So in that sense, we're relying on both. But for a moment, if I can go back, Judge Henderson, to talking about the language in the report about the phone record, the subpoena and the phone records, what the committee was doing at the time was it was interviewing witnesses, conducting depositions and reviewing materials that people were providing to it, even though the administration at the time was not allowing any official records to come forward. So as the committee was taking people's depositions and acquiring information through oral recollections and people's best memories, they were left with several significant gaps as to what people couldn't remember, as to what people thought might have happened. A witness might have said that they thought that they took a phone call from a particular individual at a particular time, but since they hadn't been given access to their records, they weren't able to state that. So what the committee was doing was using the phone record subpoenas to fill in the gaps from the information that it had. And that was its purpose. Its purpose was not to invade the privacy of the individuals. It was simply to corroborate and fill those gaps that it was getting from the oral recollections of the witnesses and the other documents that it was obtaining. So there is no question here in our mind that these subpoenas satisfy the legitimate legislative purpose test. But as we said at the outset, that's really not of any significance here because what's going on here is Judicial Watch's attempt to bring the committee and the chairman before the court in a manner that it's simply not permitted to do. The mere fact that Judicial Watch is asking for the case to be remanded so that further factual developments can be had is itself what the court is intended to protect against. And what this court has said on numerous occasions is that the clause protects the House and its committees and its members from having to do, which is to defend itself in litigation, defend itself from having civil suits brought against it, and ultimately here to defend itself from having court-ordered production of documents that it simply has already made its own decision not to release to the public. So is there any limitation to this can the subpoena be issued for any information and that can't be beyond the scope of the speech and debate clause protection? No, Your Honor. I don't think there is any subpoena that cannot be beyond the scope. The question is sort of how does that question come before the court? Had in certain instances, and we've seen this in the past, had one of the telecommunications companies challenged the validity of the subpoena or sought to refuse producing the records, there could have been contempt proceedings, which is how Kilbourn and Watkins, the cases that Mr. Peterson cited, came before the court. Had AT&T refused to produce the subpoenas, the committee could have attempted to bring an enforcement action to this court against AT&T that would have allowed this court to review and adjudicate that question. What we do know for certain is that the question can't be brought before the court in the manner that it's being brought before it here, which is as a suit against the committees, and certainly as a suit here under the common law right of access, which clearly doesn't apply to these particular documents because the constitutional privilege precludes the application of that common law right. Now what's your authority for what you just said? I have not found any case that upholds the speech or debate clause immunity with regard to the common law right of access. Your Honor, I don't believe that there is a case that holds that because there haven't been cases litigated against Congress as applying for the common law right of action in this court. There was the Pentagen case in the lower court, which found that those records were not applicable to common law right of access and protected by the speech or debate clause. Well, that's because they weren't public records. If we get through the first prong that these subpoenas are in fact public records, then the second prong requires balancing the right of the public to know things versus whatever the governmental right is, which in this case is the speech or debate. I don't think that question has ever been raised before. I am unaware of a case that raises that question as well, Judge Henderson, and we think not only can you not actually get past the speech or debate immunity in this case, but even if for some reason you concluded that you could, I don't think that the subpoena is in question here for the reasons that we discuss in our papers, that the plaintiffs have satisfied the common law right of access standard. The subpoenas themselves don't meet the definition of a public record as the court has defined it in this instance, and so we don't think that even if you could get that far, which we don't think... Let's say you can. Let's say they're public records. What about the second prong? Certainly, Your Honor. I think the second prong, you hinted at it earlier, the interest that there are two interests at the committee that needs to be protected. One is making sure that its investigative sources and methods and its decisions about its investigative process would need to be protected, but also there's likely to be substantial privacy interests on the part of the many people whose phone numbers may have been sought as part of this inquiry, so releasing that information would expose those personal details and might actually cause more very carefully elected to make public and what it has not. So I don't think that those interests are outweighed by the claims by the plaintiffs that there's this general right to know. The report makes it very clear exactly what the committee did and lays out its evidence that it used to rely upon and to recommend to the Judiciary Committee that articles of impeachment be drafted. As you well know, those articles were drafted, approved by the court, and tried by the Judiciary Committee. So I don't think there's much of an interest beyond what's already been publicly released. Well, I do think it's, if not ironic, noteworthy that one of the interests you've just put forward is the invasion of privacy when the whole claim of Judicial Watch is that this Your Honor, I think that the committee was very careful to not only draft its subpoenas in as narrow a way as possible, but also to only release the information that was relevant to its inquiry. As in every inquiry of this type, the committee receives a tremendous amount of information that ends up being responsive to its subpoenas, but not ultimately relevant to the questions before it. The committee was careful in describing the evidence that was relevant to it. I don't believe that is the entirety of everything that the committee received, or even the entirety of everything the committee asked for in its subpoenas. So while we would submit that there were certainly, there very likely were information sought and received by the committee that ended up not being particularly relevant or not useful to its inquiry, that would be the type of information that shouldn't be further released and that further release would do damage to. Certainly, there were people's information that was released and discussed in the report and obtained by the committee. We don't deny that. But we think that the committee carefully made that determination on its own. That determination is to be respected and should be not second-guessed or overturned by plaintiffs mere allegations, and is subject to, you know, among other things, a presumption of Okay. Do my colleagues have any questions of Mr. Tatelman? All right. Then, Mr. Peterson, I don't know how much time you reserved, but take two minutes. All right. Mr. Peterson. Yes, thank you. Yes, thank you, Your Honor. We're having issues with the mute button there. What Mr. Tatelman just expressed in terms of whether or not the power is unlimited and unreviewable was extraordinarily revealing. He stated openly that, well, the telecommunications companies could have challenged the subpoena, and they didn't, apparently. We don't know for sure. But that is precisely the point. They went behind the individual's backs, and instead of going to the individuals for the phone records, they went to the telecommunications companies, which are highly regulated by the government, beholden to Congress, and, of course, they rolled over. And these individuals' rights were violated without any opportunity for judicial review. That is exactly why there needs to be not this unlimited power on behalf of Congress. And that is why there's a very real question here of whether it's a legitimate legislative act. And the 2015 decision in Wrangell that Judge Henderson authored, that was a very different case. I mean, that involved a challenge to a censure. As we've just heard, this is a common law right of access case. We don't need to be, we don't need, Judicial Watch does not need to be the party, doesn't have to, by analogy, but doesn't have to be the victim of government misconduct to bring a FOIA request. The public has a right to know under the common law right of access, a right that has been consistently withheld by the Supreme Court in this court, to learn what is going on. Mr. Tatelman said repeatedly all the different things that they got, but they haven't released and otherwise. Well, again, that is precisely the point. We need to learn more. We need to understand because very serious, very serious matters happen here, invasions of privacy, violations of rights, behavior by this committee. It is not an unlimited power and it cannot be an unlimited power or the next time the consequences will be very, very serious. All right, Mr. Tatelman, if my colleagues have no questions, then the case is submitted.
judges: Henderson, Rogers, Wilkins